REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2302

September Term, 2012

BLACKSTONE INTERNATIONAL LTD., ET AL.

v.

MARYLAND CASUALTY COMPANY, ET AL.

Eyler, Deborah S.,
Matricciani,
Clagett, Marjorie L.
  (Specially Assigned),

JJ.

Opinion by Matricciani, J.

Filed: February 28, 2014

On May 17, 2011, Maryland Casualty Company and Northern Insurance Company of New York, (collectively, "the Insurers"), brought a complaint for declaratory judgment in the Circuit Court for Baltimore County, against Blackstone International, Ltd., and John R. Black (collectively, "Blackstone"). The complaint asked the circuit court to declare that the parties' insurance policy did not cover a lawsuit brought against Blackstone by RMG Direct, Inc. ("RMG"), and that the Insurers had no duty to defend Blackstone in that suit. Blackstone counter-claimed for opposite declarations and asked the court to order the Insurers to pay the costs of litigation in the RMG case and in the present case, as well as to indemnify Blackstone for any damages arising from that case.

Blackstone moved for partial summary judgment on the duty to defend in the underlying litigation, and the Insurers moved for summary judgment as to both their duty to defend and their duty to indemnify. The circuit court granted the Insurers' motion and entered summary judgment in their favor, from which Blackstone timely appealed, bringing the case before this Court.

## QUESTION PRESENTED

Blackstone presents the following question for our review, which we have rephrased to comport with our discussion:

> I. Did the trial court err when it entered summary judgment in favor of the Insurers on the grounds that the underlying claims against Blackstone did not constitute "advertising injuries" under the parties' insurance agreement?

For the reasons that follow, we answer yes, and we therefore reverse the judgment of the Circuit Court for Baltimore County and remand the case for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

Blackstone designs and manufactures lighting products, including those that mimic natural light, which are known as "full spectrum" lights. In February 2010, Blackstone was sued by RMG, whose complaint claimed, in part, that the two parties had agreed to a "joint venture to develop plans for the design, marketing and sale of low vision lighting products to retailers." RMG further alleged that Blackstone had promised to give RMG seven percent of its gross revenues from the sale of these products, and that RMG was to have a "fifty-percent [] interest in the newly created brand for the sale of low vision light products."

RMG claimed that its efforts in the joint venture yielded expert evaluations and product testimonials, the "Vision Enhance" brand name, the slogan "*to help you see better*," and the product's packaging design and "copy" (the content displayed on the packaging). According to the complaint, Blackstone used and distributed this content in various forms, including its product packaging, a website, a trade publication advertisement, and third-party catalogs, as well as in sales sheets, informational offerings, and marketing presentations to retailers such as Wal-Mart. According to RMG, sales were so successful that Wal-Mart adopted the product into its own private-label line of products.

RMG asserted several causes of action in its complaint against Blackstone. First,

RMG claimed that Blackstone breached an oral contract[1] between the parties by failing to pay RMG either its commission or profits from its one-half interest in the parties' new venture. Second, RMG claimed that its detrimental reliance on Blackstone's promises estopped Blackstone from withholding those payments. Third, RMG claimed that Blackstone was unjustly enriched because it "continues to retain the benefit conferred upon it by Plaintiff through, in part, its use of concepts, expert evaluations, [the] 'Vision Enhance' brand name[,] and packaging, all of which were developed by [RMG] or with [RMG]'s assistance."[2] Fourth, RMG claimed intentional misrepresentation of the promises supporting the above claims. Finally, RMG demanded an accounting of Blackstone's profits.

Blackstone has been insured by the Insurers for commercial general liability since 2001. The parties' agreement places upon the Insurers the duty to defend Blackstone against any suit seeking damages from an "advertising injury," which the policy defines as injuries arising out of the use of another's advertising idea in Blackstone's advertisement, or out of infringement upon another's copyright, trade dress, or slogan.[3]

---

[1] RMG conceded that the parties never signed a written agreement.

[2] RMG also brought a count labeled "quantum meruit," but as we recently explained in *Dolan v. McQuaide*, 1433 SEPT.TERM 2012, 2013 WL 5926743 (Md. Ct. Spec. App. Nov. 5, 2013), *quantum meruit* is not a theory of recovery *per se* but is a measure of damages recoverable for breach of implied contract or unjust enrichment.

[3] The relevant language in the insurance agreement is as follows:

(continued...)

The policy's text excluded, however, injuries arising out of a breach of contract, except an implied contract to use another's advertising idea in Blackstone's advertisement.[4]

---

[3] (...continued)

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. . . .

\* \* \*

**SECTION V - DEFINITIONS**

\* \* \*

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters . . . includ[ing] material placed on the Internet or on similar electronic means of communication[.]"

\* \* \*

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

\* \* \*

f. The use of another's advertising idea in your "advertisement"; or
g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

[4] The policy's exclusions provide, as follows:

(continued...)

-4-

Blackstone gave the Insurers notice of RMG's suit in a timely fashion, but the Insurers denied that RMG's claims fell within the scope of the policy's "advertising injury" clause. Blackstone eventually settled with RMG, but only after incurring an alleged $1,056,008.63 in attorney's fees, which the Insurers refused to pay. The Insurers brought a complaint in the Circuit Court for Baltimore County, seeking a declaratory judgment that they had no duty to defend or indemnify Blackstone. Blackstone counter-claimed for the opposite declaration and attorney's fees in both the underlying litigation and the instant suit. Blackstone moved for partial summary judgment on the issue of the Insurers' duty to defend, and the Insurers moved for summary judgment on both their duty to defend and to indemnify Blackstone. The circuit court found for the Insurers and entered summary judgment in their favor.[5] Blackstone then filed a timely appeal, bringing the case before this Court.

---

[4] (...continued)
This insurance does not apply to:

    a. "Personal and advertising injury":

        (1)    Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

                          \*     \*     \*

        (6)    Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement."

[5] The circuit court did not file a separate, written declaration and only announced its findings on the record.

## DISCUSSION

### Standard of Review

This case comes to us on disposition by summary judgment under Maryland Rule 5-201(f). We therefore review the trial court's ruling *de novo* and examine the record independently to determine whether there exists any genuine issue of material fact and whether the moving party was entitled to judgment as a matter of law. *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14 (2004) (citation omitted). In doing so, we must review the record in the light most favorable to the non-moving party and construe against the moving party any reasonable inferences which may be drawn from the facts. *Id*.

Because a policy of insurance is a contract, we construe it according to contract principles. *Walk*, 382 Md. at 14-15 (citation omitted). Unless there is an indication that the parties intended to use words in the policy in a technical sense, the terms of the contract are accorded their customary, ordinary, and accepted meanings. *Id*. If the terms are unambiguous, a court has no alternative but to enforce them. *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556-57 (2001) (citing *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 171 (1997)). Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer. *Dutta*, 363 Md. at 556. "Nevertheless, under general principles of contract construction, if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument*." *Id*. at 556-57 (citing *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*,

-6-

117 Md. App. 72, 97-98 (1997)) (emphasis in original).

## I.

The Insurers' duty to defend Blackstone in the underlying litigation depended on the character of RMG's claims:

> If the plaintiffs in the [] suits allege a claim covered by the policy, the insurer has a duty to defend. Even if a [] plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy.

*Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 407-08 (1975) (emphasis added), *cited in Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 102-03 (1995). Further, an insurer is obligated to defend *all* claims, notwithstanding alternative allegations outside the policy's coverage, until all potentially covered claims are resolved. *Utica Mut. Ins. Co. v. Miller*, 130 Md. App. 373, 383 (2000) (citations omitted).

The parties stipulate that Blackstone had performed all prerequisites to coverage, and that the case resolves to whether RMG's complaint triggered the Insurers' contractual duty to defend. In the present case, all claims remained viable until Blackstone and RMG reached a settlement. Therefore, Blackstone is entitled to have the Insurers reimburse all of its defense costs if they had a duty to defend *at least one* count of RMG's complaint. The Insurers argue that they had no duty to defend because the RMG complaint alleged neither the use of RMG's advertising ideas in Blackstone's advertisement, nor a

-7-

qualifying "advertising injury."  We address each contention, in turn.[6]

### A.  Use of RMG's Advertising Ideas in Blackstone's Advertisements

The Insurers argue that the trial court rightly denied Blackstone's motion for summary judgment because RMG's claims nowhere described use of its advertising ideas in Blackstone's "advertisements."  The parties' agreement defines "advertisements" as "a notice that is broadcast or published to the general public or specific market segments about [Blackstone's] goods, products or services for the purpose of attracting customers or supporters . . . includ[ing] material placed on the Internet or on similar electronic means of communication[.]"  According to Blackstone, RMG complained of injuries from several types of advertising: 1) a product website; 2) product packaging and instructions; 3) advertisement in a trade publication and third-party catalogs; and 4) sales sheets, informational offerings, and marketing presentations to large retailers, including Wal-Mart.

First, the Insurers argue that the evidence of a Blackstone website using RMG's advertising "is contested," and that testimony from the RMG suit "casts doubt on whether

---

[6] The Insurers divide their argument into three elements drawn from *Walk*, 382 Md. at 17, namely: "(1) an 'advertisement'; (2) an 'advertising injury,' which entails the copying of an advertising idea or style into an advertisement; and (3) a causal relationship between the advertising injury and the alleged damages."  That delineation, however, is not suited to the present discussion.  As our opinion makes clear, below, "causation" in this case is subsumed within the contractual definition of "advertising injury," leaving only the first two issues.

this image was ever used to solicit customers." But "an insurer may not use extrinsic evidence to contest coverage under an insurance policy if the tort suit complaint establishes a potentiality of coverage," *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 107 (1995), and an allegation that is "contested" or in "doubt" is nonetheless sufficient to show its *potential* truth, *see 7416 Baltimore Ave. Corp. v. Penn-Am. Ins. Co.*, 83 Md. App. 692, 699-700 (1990). Therefore, the factual allegations in RMG's complaint sufficed to show that the website was a *potential* advertisement that triggered the Insurers' duty to defend.

Second, the Insurers cite several cases to argue that Blackstone's product packaging is not an "advertisement." These cases, however, hold that a *product itself* is not advertising. *See, e.g., Krueger Int'l, Inc. v. Fed. Ins. Co.*, 647 F. Supp. 2d 1024, 1035 (E.D. Wis. 2009) (citing *Westport Reinsurance Management, LLC v. St. Paul Fire & Marine Ins. Co.*, 80 Fed. Appx. 277, 279 (3d Cir. 2003); *Green Mach. Corp. v. Zurich–American Ins. Group*, 313 F. 3d 837, 841 (3d Cir. 2002); *Accessories Biz, Inc. v. Linda and Jay Keane, Inc.*, 533 F. Supp. 2d 381, 388 (S.D.N.Y. 2008); *Hosel & Anderson, Inc. v. ZV II, Inc.*, 2001 WL 392229, *2 (S.D.N.Y. 2001)). But these cases are inapposite because RMG's allegations did not depend on the product *itself* being advertising, but rather the ideas *shown on the packaging* in which Blackstone's products was shipped and displayed.

The Insurers contend that even if Blackstone's product packaging *was* designed to

"attract customers or supporters," it did so on an individual basis as a "solicitation," rather than as "a notice that is broadcast or published to the general public or specific market segments" (per the insurance agreement's definition of "advertisement"). This argument, however, overemphasizes the customer's immediate perception and ignores the fact that Blackstone *distributed* advertising ideas on standardized packaging, with the evident intent to reach and attract a wide audience of shoppers at the product's point of sale. This brings Blackstone's alleged conduct within at least one of the ordinary meanings ascribed to "publish," *i.e.*, "to disseminate to the public" or "to produce or release for distribution."[7] "Publish," *Merriam-Webster.com* (Merriam-Webster 2014), http://www.merriam-webster.com/dictionary/publish. Moreover, the Insurers' definition of "advertisement" would turn any content viewed by isolated customers into an individual solicitation, which would create the absurd result of turning a wide array of advertisements—on television, in magazines, and on the internet—into "personal solicitations." We therefore conclude that Blackstone's product packaging could be an "advertisement" under the present insurance agreement.[8]

_____

[7] Blackstone's actions also fall within the gambit of "broadcast," as something "made widely known." "Broadcast," *Merriam-Webster.com* (Merriam-Webster 2014), http://www.merriam-webster.com/dictionary/broadcast.

[8] The same could not be said of the product instructions. Instructions have been considered advertisements where they contain information about technical specifications, product advantages, compatibility, and installation and warranty information. *Teletronics Int'l, Inc. v. CNA Ins. Co./Transp. Ins. Co.*, 120 F. App'x 440, 445 (4th Cir. 2005). But in the *Teletronics* case, that information was disseminated over the internet to *potential*

(continued...)

-10-

Third, the Insurers argue that "an advertisement procured by RMG" and "catalog placement by RMG" cannot be "Blackstone's" advertisements. And fourth, the Insurers argue that the marketing presentations Blackstone made to Wal-Mart and other large retailers were not advertisements and that they were also merely individual solicitations. We need not, however, decide these issues, because the alleged website and packaging constituted advertisements that were—at least potentially—"Blackstone's."[9]

Finally, the Insurers argue that even if Blackstone used advertising ideas in its "advertisements," those *ideas* were Blackstone's and not "*another's*" under the insurance policy. Specifically, the Insurers argue that Blackstone owned all disputed advertising

_____

[8] (...continued)
customers, *id.*, whereas there is no indication in RMG's complaint that consumers could have seen any instructions until *after* purchasing Blackstone's product. Thus, the instructions could not have "attracted" customers, per the policy's definition of "advertisement."

[9] If we were to consider Blackstone's argument about the advertisements procured by RMG, our decision would not fall in the Insurers' favor. They fail to explain why those advertisements should not be attributed to Blackstone in this case. The complaint plainly implies that RMG was acting as Blackstone's agent—or at least in reliance on Blackstone's promises—when it placed the advertisements, whether or not there was a formal joint venture between them. As such, there was at least a potentiality that the phrase "your advertisements" in the insurance policy described those that RMG allegedly placed on behalf of Blackstone.

That would leave the Insurers' argument that marketing presentations to large retailers are not advertisements but are individual solicitations. We would not reject this argument out of hand, but neither would we foreclose the opposite conclusion, which is that Blackstone presented standardized materials to a large enough number of retailers to constitute a "specific market segment."

-11-

ideas[10] by virtue of its joint venture with RMG.  But this joint venture, along with the agreement purporting to assign Blackstone all property rights,[11] was only *alleged* in some of the complaint's counts, and RMG's claim of unjust enrichment did *not* rely on a binding joint venture agreement, or on any joint venture at all.  Furthermore, a plain reading of the contractual language does not support the Insurers' argument over "ownership" because the possessive case can indicate not only *ownership*, but also *origin*. "Possessive," *Dictionary.com Unabridged* (Random House, Inc. 2013) ("indicating possession, ownership, *origin*, etc." (emphasis added)), http://dictionary.reference.com/ browse/Possessive.  Thus, even if Blackstone owned some or all rights to the disputed advertising ideas, those ideas could nevertheless be described as "another's" because of their origin at RMG.

For these reasons, we conclude that RMG's complaint alleged that Blackstone used RMG's advertising ideas in its advertisements.  This leaves us to consider whether Blackstone's advertisements gave rise to any covered "advertising injury."

### B.  "Advertising Injury"

The Insurers argue that RMG's claims did not allege any "advertising injury" to

---

[10] Other than its attack on the product packaging, the Insurers do not appear to dispute that the content displayed and otherwise incorporated in these advertisements— the brand name, slogan, testimonials, design, and copy—constituted "advertising ideas."

[11] According to the complaint, RMG and Blackstone agreed to terms reflected in a written contract that was never signed, but which provided that "Blackstone will be the owner of all assets and property rights related to the Vision Enhance Division including, but not limited to, domain names, intellectual property rights, and goodwill.  . . ."

defend against. Specifically, they contend that "the principle [sic] purpose of a liability policy [is] to protect insureds from their own *tortious, negligent conduct*" (emphasis added) and not the harms alleged in RMG's complaint. Continuing, the Insurers contend that "the gravamen" of RMG's complaint "is not damages caused by Blackstone's advertisements but rather damages caused by Blackstone's failure to abide by an agreement to pay RMG commissions," and that the complaint is "replete" with references to that agreement for commissions. Thus, the Insurers conclude that "Blackstone would have the Court transform Policy coverage from a protection against tortious, negligent conduct into a protection against failures to comply with contractual agreements for the payment of commissions."

There are two flaws in the Insurers' general argument. First, the policy's duty to defend is not determined by the "gravamen of the complaint;" rather, Maryland Law imposes a duty to defend if there exists even a *single claim* that could *potentially* be covered, *Utica Mut.*, 130 Md. App. at 383. And although we may look to the "gravamen" of particular causes of action to determine whether they could be construed in favor of the insured as covered claims, we must nonetheless consider each one individually, according to the insurance policy's language. *Montgomery Cnty. Bd. of Educ. v. Horace Mann Ins. Co.*, 383 Md. 527, 547-48 (2004).

Second, although we have every reason to believe the Insurers' proffer that they intended their policy to cover only Blackstone's "tortious, negligent conduct," the policy

does not do so by defining "advertising injury" that way. The policy contains *express exclusions* that have that effect,[12] but the Insurers *deliberately waived them* at trial, writing in a proposed statement of undisputed fact that their defense does "not rel[y] on the breach of contract exclusion," which they deemed "irrelevant" to the instant case. Later, at the hearing on the parties' cross-motions for summary judgment, the Insurers addressed the policy's exclusions in greater detail:

> . . . [I]t's clear on the face of the second amended complaint that the allegations don't come within the policy coverages. But even if Blackstone could get over that hurdle, then we do look down to the exceptions, I'm sorry, the exclusions. And there are two relevant exclusions in this case. The first is that the policy does not provide coverage for advertising injury caused at or direction, at or, by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict personal or advertising injury. So if we assume here that [RMG] didn't transfer the rights, then what we get to is did [RMG] say regardless of who owned the rights I'm going to use them? And the exclusion would become applicable. Secondly, and although Maryland Casualty didn't put this in the litigation and, and there's a very clear reason why Maryland Casualty didn't put it in the litigation at this point. There's a contract exclusion. Again, with respect to the shifting of burdens of proof, we think that Your Honor can rule as a matter of law on the insured's burden and its failure to meet the burden to show that the coverage comes within the insuring agreement. *If we go down to the exclusion, it becomes my burden. It makes it*

___

[12] These exclusions described injuries "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury,'" and injuries "[a]rising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement.'"

-14-

*harder to deal with on summary judgment but and so we decided not to include it.* But there's a, a, an exclusion that says for advertising injury arising out of breach of contract except an implied contract to use another's idea in your advertising. So breach of contract, if it's a breach of contract it's out the door.

(Emphases added.)

If we give the Insurers the benefit of the doubt, their statements that they "didn't put *this* in the litigation" and "decided not to include *it*" refer only to the contract exclusion and not to the exclusion for knowing conduct. But regardless of whether their intention reached only one and not the other exclusion, the Insurers omitted *both* from their memorandum opposing summary judgment, and they have not addressed or otherwise incorporated either one in their appellate arguments. Instead, the Insurers urged the trial court not to "get bogged down" in the contractual language and to construe the agreement in their favor because "[t]he *intent of a general liability policy* is to provide coverage, and perhaps indemnity in certain cases, for alleged unintentional tortious actions" (emphasis added).[13]

---

[13] The Insurers explained in the above passage that they decided not to argue the policy exclusions because of the burden it would place on them. But we are not sure of what burden they meant. Ordinarily, an insurer denying coverage based on a policy exclusion bears the burden of proof. *See Mut. Fire Ins. Co. of Calvert Cnty. v. Ackerman*, 162 Md. App. 1, 7-8 (2005). The present dispute, however, reached only the Insurers' *duty to defend* and did not require proof of a *factual* circumstance tantamount to an affirmative defense. *See id*. (circuit court correctly placed factual burden on insurer because proving that an exclusion applied "was in the nature of an affirmative defense") (citing 14, 17 Lee R. Russ *et al.*, *Couch on Ins.* §§ 81.81, 94.108, 254:86 (3d ed. 2012)).

(continued...)

-15-

The Insurers may have seen the details of their contract's language as a "bog" impeding their case, but from our vantage point, words are the very foundation of contracts and the law. Language is a tool that can be used—even if only imperfectly—to memorialize an agreement between two parties, helping them plan their future conduct and resolve disputes, should they arise. And although our goal in construing a contract is "to ascertain and effectuate the intent of the parties to the agreement," *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 96 (1997), we cannot, in fairness to Blackstone, allow the Insurers to revive an argument that they waived at trial by relying on the policy's exclusions.

Having limited the present dispute to the plain meaning of "advertising injury" in the parties' agreement, the exclusions belie the Insurers' contentions. They argue that wherever an insurance agreement defines "advertising injury" as "any injury arising out of the use of another's advertising idea in your advertisement," this definition excludes—by default—all injuries arising from intentional conduct or breach of contract. But the Insurers carved exactly those kinds of injuries out of "advertising injury" by drafting express exclusions to that term's definition. This implies that, had intentional conduct and breaches of contract *not* been excluded, they would fall *within* the

---

[13] (...continued)
While Blackstone's arguments on the duty to defend did in some sense burden the Insurers, they did so only as a matter of legal argument, not proof by a preponderance of the evidence.

-16-

agreement's broad and unambiguous definition of "advertising injury."[14]  And this broad

and unambiguous definition is all that is left for the Insurers to use in their defense,

having expressly stated to the trial court that they would not rely on those exclusions to

argue against their duty to defend Blackstone.  Thus, as presented to us, the Insurers' duty

to defend Blackstone depends only on whether RMG's claims "arose out of" the use of

RMG's advertising ideas in Blackstone's advertisements, without regard to whether the

acts were intentional or rooted in breach of contract.

In Maryland, the phrase "arising out of" in an insurance contract triggers a

causation analysis requiring a "direct or substantial" relationship between cause and

effect.  *See State Farm Mut. Auto. Ins. Co. v. DeHaan*, 393 Md. 163, 178-79 (2006); *Nat'l

Indem. Co. v. Ewing*, 235 Md. 145, 149 (1964) ("[W]hile the words ["arising out of"]

import and require a showing of causal relationship, recovery is not limited by the strict

rules developed in relation to direct and proximate cause.").  Turning to RMG's

complaint, we see that its claims for breach of contract, promissory estoppel, and

---

[14] The Insurers correctly argue that coverage for claims does not arise
automatically from the fact that they are an exception to an exclusion, and that claims
falling under such an exception must be covered by the insurance agreement, in general.
*See Maryland Auto. Ins. Fund v. Baxter*, 186 Md. App. 147, 163-64 (2009).  Our opinion
obviates this rule by subjecting each of RMG's claims to analysis under the entire
agreement, regardless of whether it constituted an exception to an exclusion.  But more
importantly, our opinion does not implicate this rule in the first place; we are concerned
*not* with an *exception* to an exclusion, but rather with the *complete absence* of *potential
exclusion*, and what that implies about the meaning of the term that now has, *de jure*, no
exclusions.

intentional misrepresentation do not meet this definition because they all allege that

Blackstone was indebted to RMG by virtue of the *work* that RMG performed to *develop*

advertising content. As such, the claims remained viable even if Blackstone had never

used the disputed advertising ideas to sell its products. These claims did not, therefore,

depend on Blackstone's alleged "use" of RMG's advertising ideas, and so they did not

"arise out of" the same.

RMG's remaining unjust enrichment claim *did*, however, depend on Blackstone's

use of RMG's advertising ideas. In that count, RMG alleged that Blackstone was unjustly

enriched by retaining the benefit flowing from its use of RMG's ideas in advertisements

for Blackstone's products. The complaint's count for unjust enrichment therefore bore a

"direct and substantial" relationship to the use of RMG's advertising ideas in

Blackstone's advertisements, *see DeHaan*, 393 Md. at 178-79, making that claim an

"advertising injury" under the parties' insurance agreement.

Having waived at trial the policy's exclusions, the general definition of

"advertising injury" bound the Insurers to defend Blackstone against RMG's unjust

enrichment claim, even if their intent was to exclude that cause of action as an

"intentional" act or breach of contract.[15] And because that covered claim survived

_____

[15] We note that even if the Insurers had not waived the policy's contract exclusion, it would appear not to work in their favor. RMG claimed unjust enrichment and promissory estoppel as equitable *alternatives* to breach of contract. Therefore, these claims did *not* "arise out of" Blackstone's alleged breach of contract, or out of any other

(continued...)

-18-

throughout the proceedings in RMG's suit against Blackstone, Maryland law obligated the Insurers to defend Blackstone against all of RMG's concurrent claims.[16] *See Utica Mut.*, 130 Md. App. at 383. The trial court therefore erred when it denied Blackstone's motion for summary judgment declaring that the Insurers had a duty to defend in the underlying litigation.

## C. Damages

With the Insurers' duty to defend decided in its favor, Blackstone argues that we should instruct the trial court, upon remand, to award the total amount of damages demanded in its counterclaim. According to Blackstone, these damages flow automatically from liability because "the Insurers cannot point to a single piece of evidence creating a factual dispute . . . as to the reasonableness of Blackstone's defense costs." In response, the Insurers argue that the fee invoices Blackstone submitted at trial

---

[15] (...continued)
purported "agreement." (These claims would, however, appear to be excluded as intentional or knowing acts.)

[16] We reach all of these conclusions on the face of the complaint, so there is no need to rely on the extrinsic evidence that the Insurers argue should be excluded from consideration. *Montgomery Cnty. Bd. of Educ. v. Horace Mann Ins. Co.*, 383 Md. 527, 538 (2004) (citing *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 107 (1995)) ("[W]here the underlying complaint in the tort action neither conclusively establishes nor conclusively negates a potentiality of coverage, an insurer must examine any relevant extrinsic evidence brought to its attention that might establish a potentiality of coverage."). And because Blackstone's arguments are sufficient under its "advertising idea" policy coverage, we need not address the Insurers' argument that RMG did not allege the only other category of "advertising injury," infringement upon another's copyright, trade dress, or slogan.

"present a myriad of issues including, but not limited to: duplication of effort, billing inefficiencies, overstaffing of assignments, unreasonable hourly rates, extraneous work efforts, etc."

Blackstone is correct that the Insurers have neither identified any specific charges that they considered unreasonable, nor explained why those charges are unreasonable. *See Appiah v. Hall*, 416 Md. 533, 546-47 (2010) (to avoid summary judgment, the non-moving party must present detailed and precise facts showing a material dispute). The Insurers did, however, argue that they were only obligated to reimburse Blackstone for "reasonable" fees, and that Blackstone had presented no evidence or testimony, expert or otherwise, showing that the fees were "reasonable."

When faced with an award of attorney's fees in a case such as this, the insurer is "entitled to have the amount of fees and expenses proven with the certainty and under the standards ordinarily applicable for proof of contractual damages." *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 703 (1997) (citations omitted). The Insurers' opposition to summary judgment for Blackstone raised a dispute of material fact that Blackstone did not extinguish at trial, *i.e.*, the reasonableness of Blackstone's fees spent defending itself in the underlying litigation with RMG.

Upon remand, Blackstone must prove its reasonable fees from the underlying

RMG litigation and the instant suit,[17] as well as its entitlement to indemnification.[18] *See*

*Constitution Associates v. New Hampshire Ins. Co.*, 930 P. 2d 556, 563 (Colo. 1996)

("Where there is no duty to defend, it follows that there can be no duty to indemnify.

However, where there is a duty to defend, there is not necessarily a duty to indemnify.").

Additionally, "the court must enter a declaratory judgment and that judgment, defining

the rights and obligations of the parties or the status of the thing in controversy, *must be

in writing*." *Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 363 Md. 106, 117 (2001)

(emphasis in original).

> **JUDGMENT VACATED. CASE
> REMANDED TO THE CIRCUIT
> COURT FOR BALTIMORE
> COUNTY FOR FURTHER
> PROCEEDINGS CONSISTENT
> WITH THIS OPINION. COSTS TO
> BE PAID BY APPELLEES.**

---

[17] Blackstone is entitled to reasonable attorney's fees from the instant action because it prevailed against the Insurers, who denied their duty to defend Blackstone the underlying litigation. *Nolt v. U.S. Fid. & Guar. Co.*, 329 Md. 52, 66 (1993) ("The rule in this State is firmly established that when an insured must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for its potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation.").

[18] In proceedings on indemnity, the trial court must consider whether the Insurers remain bound by their waiver of the policy's exclusions in defense of their duty to defend.